ACME FAST FREIGHT, INC., National Carloading Corporation, Republic Carloading & Distributing Co., Inc., and Universal Carloading & Distributing Co., Inc., Plaintiffs,

v.

UNITED STATES of America and the Interstate Commerce Commission, Defendants,

and

Norman C. Brinke, Intervening Defendant.

Civ. A. No. 3273.

United States District Court
D. Delaware.

Dec. 19, 1967.

Supplemental Opinion Feb. 27, 1968.

H. James Conaway, Jr., of Young, Conaway, Stargatt & Taylor, Wilmington, Del., and James L. Givan, Washington, D. C., for plaintiffs.

Alexander Greenfeld, U. S. Atty., Wilmington, Del., Donald F. Turner, Asst. Atty. Gen., Washington, D. C., and John H. D. Wigger, Washington, D. C., for the United States of America.

Robert W. Ginnane, General Counsel I.C.C. and Henri F. Rush, Jr., Washington, D. C., for Interstate Commerce Commission.

Joseph H. Geoghegan, of Potter, Anderson & Corroon, Wilmington, Del., and H. Charles Ephraim, Washington, D. C., for Norman C. Brinke, intervening defendant.

## OPINION

Before SEITZ, Circuit Judge, WRIGHT, District Judge, and LAYTON, District Judge.

LAYTON, District Judge.

This is an action brought by four freight forwarders [1] subject to Part IV of the Interstate Commerce Act, 49 U.S.C., to set aside, annul and vacate, restrain and suspend certain portions of an order of the Interstate Commerce Commission. The order of which plaintiffs complain granted Norman Charles Brinke (d/b/a N. C. Brinke) a permit to operate as a freight forwarder.[2] The action is before a three-judge court convened pursuant to §§ 1336, 1398, 2284 and 2321 through 2325 (inclusive) of the Judicial Code, 28 U.S.C.

Brinke's application filed on December 6, 1963, sought the issuance of a permit [3] to institute operation as a freight forwarder, in interstate commerce, in the transportation of general commodities between points in Dade County, Florida, on the one hand, and points in 14 states [4] on the other hand. In general, the application described the proposed service as limited to the acceptance of trailers containing single shipments moving from one consignor to one consignee on one bill of lading and to the use of Plan III trailer-on-flatcar (TOFC) service for the line haul movements. TOFC service is available under various plans.[5] Plan III provides for the shipment of two loaded trailers at a fixed charge, irrespective of the commodities loaded and irrespective of the weight of the load. The trailers must both be loaded onto the flatcar at the same origin ramp and unloaded at the same destination ramp. The applicant's primary function will be to pair single trailerload lots for travel under Plan III; i. e., upon receiving one trailer from a shipper, Brinke will find another shipper desiring to ship a trailer from the same origin and to the same destination as the first shipper. In addition to pairing Dade County shippers, the applicant will base his rates upon the actual cost (flatcar, trailer lease and drayage) of the transportation and profit instead of on the weight-density formula used by freight forwarders as these plaintiffs. By using this flat charge rate system, Brinke will pass the benefits of TOFC low cost to the shippers.

The application was referred to an Examiner for hearing in Miami, Florida, on March 9, 1964. The plaintiffs herein appeared at the hearing as protestants, offering testimony and other evidence in opposition to the application. On May 14, 1964, the Examiner filed his Recommended Report in which he proposed that the permit issue as requested. The report concludes:

"The question presented is whether the proposed service will be consistent with the public interest. There are many traffic problems facing manu-

---

1. Acme Fast Freight, Inc., National Carloading Corporation, Republic Carloading and Distributing Co., Inc., and Universal Carloading and Distributing Co., Inc.

2. Brinke Freight Forwarder Application, 326 ICC 322 (1966) entered on the Commission's Docket, No. FF–311, on February 2, 1966.

3. Pursuant to 49 U.S.C. § 1010; § 410 of the Interstate Commerce Act.

4. The fourteen states are New York, New Jersey, Pennsylvania, Maryland, Ohio, Indiana, Illinois, Kentucky, Texas, Louisiana, Georgia, North Carolina, South Carolina, and Tennessee.

5. See Eastern Express, Inc. v. United States, 198 F.Supp. 256 (S.D.Ind.1961) p. 259, footnote 2, for an enumeration of the four TOFC plans.

facturers and distributors in the greater Miami area. * * * [T]he majority are faced with a weight problem since much of their production involves items of extremely light weight in respect of which they cannot meet truckload minimums. As a result of their difficulties, most have resorted, for truckload shipments at least, to so-called private carriage. * * * Applicant proposed to take care of many of their difficulties. * * * Most important, is the prospect that his plan of operation will induce a number of substantial shippers to forego the questionable private operations into which they have been forced by economic circumstances, and utilize regulated transportation facilities. This, of itself, is in the public interest.

* * * Moreover, * * * there is no indication that the proposed service will adversely affect the operations of protestants to any material extent. They are not now handling the traffic involved, and are not likely to get such traffic in the future, regardless of the outcome of this proceeding."

Timely exceptions were taken by the plaintiffs. On October 15, 1964, the Operating Rights Review Board No. 1 filed its report, 323 ICC 376, finding:

" * * * that although protestants possess authority to provide freight forwarder service in the considered areas [6] and utilize rail TOFC service, they do not provide the low-cost service required by the shippers, and no showing has been made that they will provide such service." P. 379.

"Under the provisions of section 410 we must determine whether a qualified applicant is ready, able, and willing to perform the service proposed, and whether such service would be consistent with the public interest and the national transportation policy. We think that applicant has met affirmatively these statutory requirements,

and that an appropriate permit should issue." P. 380.

Again, timely exceptions were taken by the plaintiffs. The Commission entered its order affirming the Examiner and Board No. 1, 326 I.C.C. 322, noting:

" * * * we agree with the Board that the proposed forwarding operation will be responsive to a public need which has not been satisfied by existing services. Protestants admittedly are not providing a comparable service, and the limitation to the use of trailer-on-flatcar service contained in the Board's findings should preclude any serious diversion from protestants' services." P. 324

This action was commenced on October 20, 1966. The complaint, following the pattern of the protests made to the Examiner, the Board, and the Commission, challenged the entire application. Several months later, on March 3, 1967, the plaintiffs amended the complaint by paring it back so that the Commission's report and order are now contested only insofar as they authorize Brinke to engage in operation as a freight forwarder of general commodities *from* points in the states of New York, New Jersey, Pennsylvania, Maryland, Ohio, Illinois, Indiana, and Kentucky *to* points in Dade County, Florida.

The standard by which this Court reviews orders of the Interstate Commerce Commission is set out in the Administrative Procedure Act, 5 U.S.C. § 706:

" * * * The reviewing court shall— * * *

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—* * *
(E) unsupported by substantial evidence * * *.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error."

---

6. The 14 States enumerated supra.

As this Court observed in Acme Fast Freight, Inc. v. United States, 146 F. Supp. 369 (Del., 1956), 372 (per Leahy, C. J.):

"In approaching the problem as to whether the Commission's findings are supported by substantial evidence, certain guides are available. 'Judicial review of the findings of fact and the expert judgments of the Interstate Commerce Commission where the Commission acts within its statutory authority is extremely limited.' 'Unless in some specific respect there has been prejudicial departure from the requirements of the law or abuse of the Commission's discretion, the reviewing court is without authority to intervene. It cannot substitute its own view concerning what should be done, whether with reference to competitive considerations or others, for the Commission's judgment upon matters committed to its determination, if that has support in the record and the applicable law.' " [7]

Before reaching the issues raised by the complaint, it is essential to recite briefly the statutory standards that guided the Commission and which compose the legal framework in which the evidence is to be considered. Section 410(c) of the Interstate Commerce Act provides that a freight forwarder permit is to isuse if, and only if, the Commission finds (1) that the applicant is ready, able and willing to perform the proposed service to the extent authorized, and (2) that the proposed service is consistent with the public interest and the National

Transportation Policy. The Commission found that Brinke is ready, able and willing to perform the proposed service. The plaintiffs have not objected to this finding and we see no reason to disturb it. Therefore, only the second statutory requirement will be considered.

A statement of the National Transportation Policy is embodied in the Act:

"It is hereby declared to be the national transportation policy of the Congress to provide for fair and impartial regulation of all modes of transportation subject to the provisions of this Act, so administered as to recognize and preserve the inherent advantages of each; to promote safe, adequate, economical, and efficient service and foster sound economic conditions in transportation and among the several carriers; to encourage the establishment and maintenance of reasonable charges for transportation services, without unjust discriminations, undue preferences or advantages, or unfair or destructive competitive practices; to cooperate with the several States and the duly authorized officials thereof; and to encourage fair wages and equitable working conditions;—all to the end of developing, coordinating, and preserving a national transportation system by water, highway, and rail, as well as other means, adequate to meet the needs of the commerce of the United States, of the Postal Service, and of the national defense."

The public interest criterion was interpreted by the Supreme Court in New

---

7. Although there have been numerous definitions of the meaning of "substantial evidence" in the years since Judge Leahy's opinion, a reading of these cases does not disclose any shift from Judge Leahy's view. See e. g., Consolo v. Federal Maritime Commission, 383 U.S. 607, p. 619, 86 S.Ct. 1018, p. 1026, 16 L.Ed. 2d 131 (1966):

"We have defined 'substantial evidence' as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' [Citation omitted.]"

" '[I]t must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury.' [Citation omitted.]"

"Congress was very deliberate in adopting this standard of review. It frees the reviewing courts of the time-consuming and difficult task of weighing the evidence, it gives proper respect to the expertise of the administrative tribunal and it helps promote the uniform application of the statute."

York Central Securities Corp. v. United States, 287 U.S. 12, p. 25, 53 S.Ct. 45, p. 48, 77 L.Ed. 138 (1932):

"* * * [T]he term 'public interest' * * * is not a concept without ascertainable criteria, but has direct relation to adequacy of transportation service, to its essential conditions of economy and efficiency, and to appropriate provision and best use of transportation facilities, questions to which the Interstate Commerce Commission has constantly addressed itself in the exercise of the authority conferred. * * * "

■ In practice, the public interest standard and the National Transportation Policy are coterminous, and are both satisfied by a showing that shippers need the proposed service or by proof of some other "public interest" factor of equal or dominant importance. Acme Fast Freight, Inc. v. United States, 116 F.Supp. 97 (Del., 1953) (per Biggs, C.J.); Acme Fast Freight, Inc. v. United States, supra; D. C. Andrews & Co. of Illinois, Inc., Extension—Baltimore, Maryland, 326 I.C.C. 743 (1966).

We now turn to plaintiffs' contention that there is neither a need for the type of service embodied in Brinke's application nor is there a public interest factor of dominant importance to compel issuance of the permit here sought. The approach to such a discussion is rendered difficult because plaintiffs have abandoned their objections to that portion of the Commission's order and report granting authority to ship north from Dade County but have retained their objections insofar as authority was granted to ship from the north into Dade County.

■ In reviewing the evidence presented to the Commission, it is readily apparent that not all of the testimony bears on the north to south portion of Brinke's application which according to the Commission's statement represents less than 30% of the total authority sought. Nevertheless, all the testimony is relevant here. To truncate the north to south portion of the requested authority, treating it as though it were a separate application, would result in this Court's passing on an application quite different from that before the Commission. Common sense, orderly procedure and good administration require that a reviewing Court, under facts such as these, consider the Commission's findings in substantially the same context as that in which they were made. Moreover, the Administrative Procedure Act would seem to require a consideration of the entire record. 5 U.S.C. § 706.[8]

While only seven shippers testified in support of this application, according to the applicant they represent the feeling of at least 50 businessmen contacted in Dade County all of whom were looking for the sort of service proposed by Brinke.

From the evidence given, the Commission could fairly have concluded:

(1) Because Dade County lies on the periphery of the continental United States, a disadvantageous geographical location from a manufacturer's point of view, manufacturers there are confronted with a unique problem. Raw materials frequently must be brought in from the North and, after the products are manufactured, they again must be reshipped to the North. Thus, Dade County manufacturers need access to low-cost transportation to help offset their competitive disadvantage resulting from their remote geographical location.

(2) By far, the majority of Dade County shippers are in a position to ship

---

8. § 706 provides, inter alia:
"* * * The reviewing court shall— * * * (2) hold unlawful and set aside agency action, findings, and conclusions found to be—* * * (E) unsupported by substantial evidence * * *.

*In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party,* and due account shall be taken of the rule of prejudicial error." (Emphasis supplied.)

only one, not two, full trailerloads at a time.

(3) The railroads offer a portion of the type of service proposed by Brinke, that is, two trailers per flatcar (TOFC) etc., but, do not provide Brinke's proposed individualized service of finding an additional shipper of a single trailerload to halve the cost of the freight. Thus, either the shipper pays the full flatcar rate for his single trailer or waits a prohibitively long period until another shipper appears, who has a single trailerload going to the same destination.

(4) The freight forwarders also offer the same type of service as the railroads but base their rates on a weight-density formula which is prohibitively expensive.

(5) As a result, many Dade County shippers, and particularly those of light summer aluminum furniture extensively manufactured in Dade County, are forced to utilize private or unregulated carriage, that is, the hiring of an individual truck and driver, in order to obtain low freight rates.

(6) However, the details of shipping products via unregulated carriage are burdensome and annoying. The shippers dislike it and are anxious to find some other means of transportation sufficiently low in cost to permit them to compete with manufacturers in other areas while freeing them of the harassing details incident to private carriage, e. g., the leasing of trucks, the hiring of drivers, the preparation of special payrolls, the securing of additional insurance and the problems of complying with the workmen's compensation laws. The shipping rates under Brinke's proposal will be about the same as those by private carriage.[9] Obviously, then, what is particularly attractive to the Dade County shippers is that, by using Brinke's proposed service, they will be able to combine the advantage of favorable rates without the many annoyances of shipment via private, or unregulated carriage.

(7) The plaintiffs concede that they are not offering service comparable to that proposed in that they make no claim that they offer low-cost flat-rate TOFC service in which they will pair Dade County traffic for Plan III movement. Moreover, the plaintiffs have offered no evidence to what extent, if any, they will be adversely affected if the Commission granted Brinke's application. From the complete absence of such evidence, the Commission could reasonably conclude that Brinke's type of operation would not affect plaintiffs' operation to any material extent.

From all this we cannot say that the Commission erred in finding that there is a need for a south-north and an intra south service such as outlined in the application and that such service is in the public interest. Indeed, the plaintiffs, in withdrawing their objections to this portion of the application, must be taken for all practical purposes to have conceded the validity of the application in this respect.

Turning now to what appears to be plaintiffs' main argument, we will examine the contention that there is no substantial evidence in support of the need for Brinke's north-south proposal or, in other words, that there is not substantial evidence supporting the finding that such service would be consistent with the public interest. In so doing, we note again that this represents but a relatively small portion of the proposal contemplated by the Brinke application and must be viewed as an integral part of the entire service offered.

9. At the Examiner's hearing, Mr. Brinke was questioned, on cross-examination, about the difference in rate between his proposal and other means of transportation available to Dade County shippers. In pertinent part, he testified:
   Q. Have you determined whether the rate that has developed according to that formula would be lower than the rate which the shipper would have to pay for either motor car or freight forwarder service?
   A. I would imagine it would be a lesser amount. It is comparable to private carriage—slightly more than private carriage.

In support of their position, plaintiffs make two arguments. First, the testimony of the shipper witnesses does not amount to "substantial evidence." And second, the supporting shippers are only interested in Brinke's proposal because it promises lower rates and that such a promise is not entitled to substantial weight in determining where the public interest lies.

The testimony of three witnesses bears directly on these points.

One shipper, a Dade County manufacturer of outdoor aluminum furniture who receives raw material from Pennsylvania and who ships from Dade County to points in the Southern and the Middle Atlantic States, testified that much of his traffic moves in private carriage because he cannot meet truckload minimums or use Plan III TOFC as he has little occasion to ship two trailers to the same destination simultaneously. He indicated further that he would very much like to free himself of the annoyance of private carriage and that he regards Brinke's proposal as a way to accomplish this end.

A second Dade County shipper, the manufacturer of aluminum doors and windows, who has an opportunity to purchase a good percentage of its basic raw material, aluminum extrusions, in the Pennsylvania area, and who occasionally finds "good buys" on glass in the Cressona and Pittsburgh areas, stated that Brinke's proposal would enable his company to "get out" of the transportation business while moving materials at minimum freight rates.

A plastic pipe manufacturer who ships approximately 1.4 million pounds of polythylene or styrene to the Dade County area from sources in Ohio, Illinois, New Jersey, New York and Kentucky also supported Brinke's application. He testified that the applicant's proposed service would enable him to discontinue or curtail his private carrier activities and to reduce his transportation costs.

Plaintiffs' first contention, that the testimony of the shipper witnesses does not amount to substantial evidence in support of the Commission's findings of a need for north to south service is without merit. We cannot say from a reading of the entire record, giving particular attention to the testimony of the witnesses detailed above and due regard to the expertise of the Commission, that there was error in the Commission's finding on this score. We believe that the evidence supporting the north-south part of the application represents substantial evidence within the definition of that term.[10] This is particularly true when it is remembered that plaintiffs gave no testimony whatever in opposition to the north-south shipment part of the application except that such service was in effect no different from the type of service plaintiffs already offer. We have previously considered and rejected this argument because Brinke proposes to pair trailerloads of individual shippers for Plan III TOFC travel on a low cost, flat-rate basis, while the plaintiffs' service lacks these important features.

■ The short answer to the second of plaintiffs' two contentions is this. We cannot agree that rates are not entitled to substantial consideration in a freight forwarder application proceeding. The Interstate Commerce Act § 410(c) neither requires a consideration of rates in express terms nor does it proscribe their consideration. 49 U.S.C. § 1010(c). However, the legislative history surrounding the enactment of the 1957 amendment to § 410(d) of the Act and the amendment itself [11] suggest that Congress desired to leave questions of competition—and so rates—largely to the judgment and expertise of the Commission, subject only to the limited review set out in the Administrative Pro-

10.  " '[I]t must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury.' " Consolo v. Federal Maritime Commission, supra.

11.  See Frank P. Dow Co., Inc., Ext.— Longview, 303 I.C.C. 301 (1964).

cedure Act. In addition, the National Transportation Policy includes promoting "economical service." [12] Moreover, we cannot agree that the desire for lower rates was the sole motivation of the supporting shippers in testifying in favor of Brinke's application. As has been previously noted, an important consideration was the desire of these shippers to break free of the burdens of private carriage.

■ The plaintiffs make a further argument to the effect that the Commission erred in failing to take account of the adverse effects that Brinke's proposed operation would have on them. But because plaintiffs introduced no evidence throughout the administrative proceedings to substantiate their argument, our conclusion cannot be, and is not, affected by this unsupported contention.[13]

■ In our judgment then, considering the expertise of the Commission in this type of matter and the limited power of this Court on review of a Commission's findings, we are unable to say that the Commission erred in concluding that Brinke's proposed freight forwarder service, both south-north and north-south, was needed and that it would be consistent with the public interest.

Having determined, after a review of the entire record, that the findings and order of the Commission in the instant case are supported by substantial evidence, we address ourselves now to plaintiffs' alternative proposition that the report and order are not in accordance with the law in that they authorize a freight forwarder permit broader than that requested. More especially, plaintiffs submit that the permit should be modified to conform with the application by restricting the authorized service to the forwarding of trailers containing a single shipment moving from one consignor to one consignee on one bill of lading, by naming the points in those states to and from which the service may be provided, and by limiting the commodities which Brinke may transport.

■ Of the three proposed restrictions, only the first is properly before this Court. Neither of the latter raises the question whether the permit was issued in accordance with the law as the Application unmistakeably requested authority to transport *general commodities* to and from *unspecified points* [14] in fourteen states. Further, no reviewable substantial evidence issue is raised by these objections because they were not pressed before the Commission. The law is well settled that "objections to the proceedings of an administrative agency [must be made to the agency] in order to raise issues reviewable by the courts." United States v. L. A. Tucker Truck Lines, Inc., 344 U.S. 33, at p. 37, 73 S.Ct. 67, p. 69, 97 L.Ed. 54 (1952).

■ Plaintiffs request that Brinke's authority be limited to trailerload lots. Section 410(c) of the Interstate Commerce Act provides that the Commission may grant a permit to the limits of the application, but not beyond.[15] At the

---

12. The statement of the National Transportation Policy reads in pertinent part:
    "It is hereby declared to be the national transportation policy of the Congress * * * to promote safe, adequate, *economical*, and efficient service * * *." (Emphasis added.)

13. The significance of the lack of evidence on this point is heightened by the fact that plaintiffs argued:
    "[O]ur concern respecting the competitive effect of his proposed service is based, not on speculation, but on actual experience."
    The actual experience to which the plaintiffs refer is Brinke's activity un-

    der a freight broker's license issued to him in 1964. In point of fact, however, plaintiffs offered no evidence of the competitive effect of Brinke's freight broker activities.

14. Although the permit does not limit Brinke to points at which there are TOFC loading ramps, that limitation is inherent in the restriction to TOFC service for line haul movements.

15. "The Commission shall issue a permit to any qualified applicant therefor, authorizing the whole *or any part* of the service covered by the application * * *." (Emphasis added.) 49 U.S.C. § 1010 (c).

Examiner's hearing, Brinke, in explaining the scope of his application, expressly limited his proposal to trailerload lots:

Q. Do I understand you to say if you receive this authority you would not accept for transportation any freight which was tendered other than in trailer load lots?

A. That is correct.

The Examiner's recommended report and order summarize the proposal as:

" * * * confined to the use of trailer-on-flatcar service for the line haul movements, and only loaded trailers will be accepted for transportation. Thus the only consolidation and distribution to be performed will be the consolidation of two trailers for one flatcar at origin, and the only distribution or break-bulk at destination will be the breaking of the rail car. * * * "

To the same effect is the Report of the Commission:

"Applicant will furnish the trailers and, under arrangement with local drayage concerns, will pick up and deliver the loaded trailer from and to each shipper's and consignee's place of business."

From the above, there can be little doubt that the application was intended to be, and was understood as, limited to the acceptance of trailerload lots.[16] It would not be reasonable to assume that the Commission would grant a permit beyond the scope of the application in contravention to the provisions of the Act. Accordingly, we read the permit issued in response to this application as containing the trailerload lot restriction.

For the reasons given, this Court will enter an order denying the prayers of the plaintiffs' complaint.

## SUPPLEMENTAL OPINION

On December 19, 1967, this Court filed the above opinion upholding the order of the Interstate Commerce Commission granting to one Norman C. Brinke a permit to conduct a freight forwarding business from Dade County to certain northern states and return by means of what is known as Plan III trailer-on-flat-car (TOFC) service.

However, for the reasons expressed in that opinion, we interpreted the permit issued in response to Brinke's application as a grant of authority to ship TOFC in trailerload lots only.

On January 22, 1968, the United States of America and the Interstate Commerce Commission jointly moved for a clarification of that portion of our opinion which interpreted the Commission's permit as a grant of authority to Brinke to conduct his freight forwarding business in trailerload lots only. The clarification requested was to the effect that this Court did not intend in its opinion to require imposition of a trailerload lot restriction insofar as concerns Brinke's permit.

We noted in our principal opinion that there was no evidence offered by Brinke, or anyone else, before the Commission in support of a proposed grant of authority to conduct his freight forwarding business by less than trailerload lots. Indeed, the record is barren of any reference to the subject of less than trailerload lots. If then the power to grant such authority must comply with applicable evidentiary requirements, it is evident that the present motion must be denied. This follows from

16. The document styled APPLICATION FOR A FREIGHT FORWARDER PERMIT and the exhibits attached thereto (especially EXHIBIT A) do not attempt to define the proposed service with particularity. Thus, it could be argued that the scope of the application is as broad as the general language in these formal application papers. To adopt this view would be to deny what so clearly was the understanding of the Commission and the parties. The application will be read as developed at the Miami hearing.

**324**

Title 5 U.S.C. § 706, which requires the reviewing court to:

"(2) hold unlawful and set aside agency action, findings and conclusions found to be \* \* \*

(E) unsupported by substantial evidence;"

Further, we think a fair reading of the certificate and the material incorporated by reference therein does not justify the conclusion that the Commission expressed an intention to authorize the hauling of less than trailerload lots.

However, since the Commission's motion indicates that it had a contrary intent, we think the Commission should be given the opportunity to consider and explicitly express itself on this matter. To this end we will deny the motion unless, within a date to be fixed in the order on the motion, the Government and the Commission elect in writing to have the matter remanded to the Commission for appropriate proceedings to resolve, by further testimony or otherwise, whether the Certificate should be amended to include the authority to handle less than trailerload lots.