**DRUM TRANSPORT, INC., a corporation, Plaintiff,**

v.

**UNITED STATES of America and Interstate Commerce Commission, Defendants,**
**and**
**Ayers & Maddux, Inc., Intervenor.**

**No. P–3001.**

United States District Court
S. D. Illinois, N. D.
April 7, 1969.

**668**

———◆———

Donald L. Stern, Omaha, Neb., David A. Nicoll, Peoria, Ill., for plaintiff.

Richard E. Eagleton, U. S. Atty., Peoria, Ill., Steven Kazan, Interstate Commerce Commission, Office of the General Counsel, Washington, D. C., for defendants.

Donald Murchison, Beverly Hills, Cal., Gary Peplow, Peoria, Ill., for intervenor.

## MEMORANDUM DECISION AND ORDER

Before KERNER, Circuit Judge, POOS and MORGAN, District Judges.

### PER CURIAM.

Plaintiff, sometimes herein referred to as Drum, filed this action for judicial review of the final order of the Interstate Commerce Commission, hereinafter I.C.C., granting operating rights to intervenor, hereinafter Maddux, in Docket No. MC–129262, Ayers & Maddux, Inc., Common Carrier Application.

Maddux filed its application with the I.C.C., seeking authority to operate as a common carrier by motor vehicle, in interstate or foreign commerce, over irregular routes, transporting "alcoholic beverages or alcoholic liquors, in bulk, in tank vehicles * * * from all United States ports of entry on the International Boundary Line between the United States and Mexico, to points in California, Michigan, Illinois and Ohio." That application requested that the grant of authority contain the express restriction, "with no authorization to transfer property from one vehicle to another." [1]

Drum and Ringsby-Pacific, Ltd., both motor carriers engaged in the transportation of alcoholic liquors, in bulk, in tank vehicles, from such ports of entry to points within the United States, opposed the Maddux application. Drum requested an oral hearing and the right to cross-examine witnesses supporting the Maddux application. The I.C.C. rejected that request. The application was considered under the Commission's rules for modified procedure upon the written pleadings and supporting written documents alone.

The I.C.C. report and order found that public convenience and necessity required that Maddux be granted authority to operate as a common carrier, and to undertake the requested transportation from ports of entry at Laredo and El Paso, Texas, and ports of entry in Arizona and California, to Los Angeles, Menlo Park and San Francisco, California, Detroit, Michigan, Peoria, Illinois, and Cincinnati, Ohio. The requested restriction against transfer of lading between vehicles was omitted from the order upon the Commission's statement that such a restriction would be "difficult of enforcement and administratively undesirable."

After the I.C.C. denied Drum's Petition for Reconsideration, the instant complaint was filed seeking judicial review.

Drum has authority to operate as a common carrier, over irregular routes,

---

1. The words "transfer of property from one vehicle to another" or "interchange of lading" as used in this opinion mean the pumping of the liquid cargo from one trailer to another. The mere change of tractors hauling trailers does not constitute such transfer or interchange.

transporting alcoholic liquors, in bulk, in tank vehicles, from all ports of entry on the United States-Mexico border in Texas, New Mexico, Arizona and California, except San Ysidro, California, to points located in the 48 adjacent states of the United States. Since 1959, its equipment has been used exclusively for the transportation of alcohol and alcoholic liquors.

Operating from its East Peoria, Illinois, home office, Drum transports, as here pertinent, tequila and kahlua of Mexican origin, in stainless steel tank vehicles, from such ports of entry to consignees throughout the 48 adjacent states. Liquor is transported by Mexican carriers in tank vehicles to the given International Border port. A Drum vehicle meets the Mexican carrier at the port of entry, and the liquor is pumped from the Mexican tanker to a Drum tanker for transport within the United States.

A like service, employing the same change of lading procedure, is provided by Ringsby from the port of entry at San Ysidro, California, to Los Angeles, Menlo Park, and San Francisco, California.

Neither Drum nor Ringsby has authority to operate as a common carrier within Mexico. Thus, a change of lading between connecting carriers, the one Mexican and the other domestic, is necessary in all transportation operations undertaken by both.

The I.C.C. found that Maddux owned six tractors and two stainless steel tank trailers, and that it had four additional stainless steel tank trailers on order. Its existing equipment is licensed for operation both in Mexico and the United States. The president of Maddux owns a substantial interest in Arrendadora "AMA", S.A., a Mexican corporation and common carrier by motor vehicle, located in Nogales, Sonora, Mexico.

The Maddux application proposed a through service, provided jointly by Maddux and AMA. The Maddux equipment would be operated in Mexico by AMA, thereby enabling shippers to load tequila and kahlua into the Maddux tankers at points of origin within Mexico for shipment to points within the United States without the necessity for a change of lading between vehicles. The loaded vehicle would be transported by AMA to a port of entry, at which point the equipment would be taken over by Maddux for the necessary transportation within the United States.

The I.C.C. found that neither Drum nor Ringsby was willing or able to provide a like through service. It further found that the service proposed by Maddux was a substantially better service than that provided by existing carriers, and a new and unique service not presently available to shippers. There was no finding that the present service was inadequate.

In the view which we take of this case, we need not consider Drum's principal argument that the case must be remanded to the I.C.C. for a formal hearing for the general purpose of permitting cross-examination. We think the Commission's findings are supported by substantial evidence under the approved modified procedure, and that the findings are adequate to support the grant of operating rights to Maddux, if the authority granted is restricted in accordance with the proposal in the Maddux application. However, with that restriction removed, we believe the grant of a new certificate requires a finding, upon sufficient evidence, that existing service is inadequate. No such evidence or finding appears in the record before this court.

The Congress has stated the guidelines for the promotion of adequate systems of transportation, and the avoidance of ruinous competition, by its adoption of the National Transportation Policy, 49 U.S.C.A., Ch. 1, Hist. Note, p. 9, as follows:

"It is hereby declared to be the national transportation policy of the Congress to provide for fair and impartial regulation of all modes of transportation subject to the provisions of this Act (chapters 1, 8, 12, 13, and 19 of this title), so administered as to recognize and preserve the inherent ad-

vantages of each; to promote safe, adequate, economical, and efficient service and *foster sound economic conditions in transportation and among the several carriers*; to encourage the establishment and maintenance of reasonable charges for transportation services, *without* unjust discriminations, undue preferences or advantages, or *unfair or destructive competitive practices*; to cooperate with the several States and the duly authorized officials thereof; and to encourage fair wages and equitable working conditions;—all to the end of developing, coordinating, and preserving a national transportation system by water, highway, and rail, as well as other means, adequate to meet the needs of the commerce of the United States, of the Postal Service, and of the national defense. All of the provisions of this Act [chapters 1, 8, 12, 13, and 19 of this title] shall be administered and enforced with a view to carrying out the ·above declaration of policy." (Emphasis added.)

The emphasized language reflects a concern over fair competition in the transportation industry which was voiced by the courts even before the Policy was enacted. See, e. g., Pennsylvania R. R. Co. v. Pittsburgh, L. & W. R. R. Co., 83 F.2d 861, 863 (6th Cir. 1936). Since the enactment of the Policy, many courts have held that it is a guide for the I.C.C. and its decisions and the Act must be read in the light of the Policy. See, e. g., McLean Trucking Co. v. United States, 321 U.S. 67, 64 S.Ct. 370, 88 L.Ed. 544 (1944); American Trucking Associations, Inc. v. United States, 170 F. Supp. 38 (D.D.C.1959), rev'd on other grounds, 364 U.S. 1, 6–7, 80 S.Ct. 1570, 4 L.Ed.2d 1527 (1960); New York S. & W. R. R. Co. v. United States, 200 F.Supp. 860 (D.N.J.1961), rev'd on other grounds, 372 U.S. 1, 83 S.Ct. 614, 9 L.Ed.2d 541 (1963); Roadway Exp., Inc. v. United States, 213 F.Supp. 868 (D.Del.1963); and Southern Pac. Co. v. United States, 277 F.Supp. 671 (D.Neb.1967), *aff'd per curiam*, 390 U.S. 744, 88 S.Ct. 1442, 20 L.Ed.2d 275 (1968).

■■ Generally, in the absence of a presently competing carrier, the I.C.C. may authorize new service upon a showing that shippers need the service and this will satisfy the Policy and the public interest. *Cf.* Acme Fast Freight, Inc. v. United States, 281 F.Supp. 314, 319 (D. Del.1967, supp. opinion 1968). Where there is existing service, it may even authorize competition in order to compel adequate service. Atlanta-New Orleans ·Motor Freight Co. v. United States, 197 F.Supp. 364 (N.D.Ga.1961). However, the I.C.C.'s powers over competition are not all-inclusive, and, if destructive competition arises by virtue of a grant of authority, it may give rise to a private antitrust action. Marnell v. United Parcel Serv. of Amer., Inc., 260 F.Supp. 391 (N.D.Cal.1966).

■ Maddux asks us to hold that the I.C.C. may grant a certificate of public convenience and necessity whenever it finds that a proposed service would be a "substantial improvement" over existing service or constitute "a new and unique service not presently available to the shipping public." Texas Mexican Ry. Co. v. United States, 250 F.Supp. 946, 949 (S.D. Tex.1966). We agree that these are proper standards for the granting of a certificate, *if* the application of the standards is supported by proper findings based on sufficient evidence and *if* the actual certificate granted is not inconsistent with the findings made by the I.C.C.

An examination of some of the cases cited to us demonstrates the correctness of our decision.

In Dixie Highway Exp., Inc. v. United States, 287 F.Supp. 473, 474 (S.D.Miss. 1968), on remand, the Court said:

" * * * The action of the Commission in granting the franchise under the facts and circumstances previously stated seems to have created the greatest problem with respect to the franchise of Roadway and Mercury which were granted only five days prior to the filing of the application of Braswell herein. But criticism of such treatment of said franchises did not properly reckon with the fact that *the*

*Commission was not obliged to specifically find the transportation service of such carriers inadequate in order to find additional transportation service necessary in the public interest in the particular area. The Commission had a right to find a further need of service by the general public without a specific finding of the existence of inadequate service by either carrier.* That was merely one of the elements for its consideration but was not indispensable as a specific finding by the Commission to a proper award of a certificate. * * *"* (Emphasis added and note omitted.)

It is debatable whether the District Court, on remand, was justified in stating the rule as broadly as it is there stated. The source of its statement is the remanding opinion in United States v. Dixie Highway Exp., Inc., Braswell Mtr. Freight Lines, Inc. v. Dixie Highway Exp., Inc., 389 U.S. 409, 411–412, 88 S.Ct. 539, 540, 19 L.Ed.2d 639 (1967), wherein the Court said:

"The District Court erred in holding that it is the 'invariable rule' of the Commission to grant existing carriers an opportunity to remedy deficiencies in service, and in holding that carriers have a property right to such opportunity before a new certificate may be issued upon a lawful finding of public convenience and necessity pursuant to the statute. The Commission's power is not so circumscribed. No such limitation has been established by the Commission's own decisions or by judicial determinations. It is, of course, true that the Commission should consider the public interest in maintaining the health and stability of existing carriers, see United States v. Drum, 368 U.S. 370, 374 [82 S.Ct. 408, 410, 7 L.Ed.2d 360] (1962); but it is also true that, upon the basis of appropriate findings, 'the Commission may authorize the certificate even though the existing carriers might arrange to furnish successfully the projected service.' ICC v. Parker, 326 U.S. 60, 70 [65 S.Ct. 1490, 1495, 89 L.Ed. 2051] (1945). * * *"

Moreover, the Supreme Court further said, *id.* at 410, 88 S.Ct. 540:

"Pursuant to § 207(a) of the Interstate Commerce Carrier Act, 49 Stat. 551, 49 U.S.C. § 307(a), the Interstate Commerce Commission concluded that a certificate of public convenience and necessity should issue to Braswell Motor Freight Lines, Inc., authorizing Braswell to extend its motor carrier services to stated points. This conclusion was based upon the *Commission's finding that existing service to those points was inadequate* to serve public needs. Upon suit by several competing motor carriers serving the area, the District Court enjoined the Commission from proceeding with the grant to Braswell on the ground that the Commission had failed to make adequate findings and that it had failed to afford existing carriers an opportunity to rectify deficiencies in their service. Upon remand, the Commission did not take further evidence, but it made additional findings in considerable detail. *It again concluded that shippers and receivers were hampered by the inadequacy of existing service, and it held that, despite numerous complaints, existing carriers had not demonstrated that they could be depended upon to furnish adequate service.*" (Emphasis added).

Thus, the I.C.C. made the very findings the absence of which concerns us here.

In Nat'l Bus Traffic Assn. v. United States, 284 F.Supp. 270 (N.D.Ill.1967), aff'd, 391 U.S. 468, 88 S.Ct. 1847, 20 L.Ed.2d 750 (1968), the Court noted that the I.C.C. found the existing bus service adequate and then went on to find that the proposed service offered four "distinctive" improvements, three of which existing service did not, and could not, offer.

In the *Acme Fast Freight* case, *supra*, 281 F.Supp. at 317, the Court quoted that portion of the examiner's report which showed that he had considered the competitive effect of his recommendation. The Court remanded the case to the I.C.C. upon its determination that the grant of

authority was broader than that which the evidence supported, i. e., the certificate did not contain a restriction to shipping only in trailer-load lots. *Id.* at 323–324. In the latter respect, *Acme* is virtually indistinguishable from our case.

In Texas Mexican Ry. Co., v. United States, *supra*, 250 F.Supp. at 948, the Court noted that the examiner "discussed fully and made findings" on whether existing facilities could meet the need which the proposed "new and unique" service would meet. The Court held, *id.* at 950, that the Commission's conclusion was supported by its findings and that inadequacy of existing service "is certainly an element to be considered" though "a specific finding of inadequacy" is not necessary. While the basic facts in the case are similar to ours (the improvement was through in-bond service from points in Mexico to points within the United States without interchange of lading), apparently the case presented no problem of a certificate inconsistent with the findings.

As we analyze the opinion, V. Van Dyke Trucking, Inc. v. United States, 291 F.Supp. 97 (W.D.Wash.1968), (per curiam, No. 7753, September 30, 1968), is not in conflict with our approach. There, the I.C.C.'s denial of a request for a certificate was upheld. Though that opinion may appear to conflict with ours, we think that it does not, but simply says that the applicant there failed to prove either the offering of a distinctive service or the inadequacy of existing service as a predicative basis for the grant of operating authority.

■ We are faced with the problem that the certificate ordered by the I.C.C. did not contain the restriction which Maddux proposed and which is implied by the findings. Without that restriction, the grant of authority does not require Maddux to provide through, in-bond service without interchange of lading between vehicles. It would permit Maddux to offer the same service which Drum now provides. Under those circumstances, the "new and unique service" standard has no application, and we must hold that the findings of the I.C.C. are insufficient to support the certificate which it granted. The certificate authorizes duplicating, competitive service, and it cannot stand without a finding that presently existing service is inadequate. No such finding was made and the record before us on modified procedure does not set forth facts which would support such a finding. See Blodgett Uncrated Furniture Service, Inc. v. United States, 288 F.Supp. 591 (W.D.Mich. 1968).

■ Where such competition arises due to the omission of a restriction in a certificate, we may remand the case for correction of the certificate, or, if the I.C.C. chooses to do so, for new hearings to develop evidence which would support a finding of inadequacy of existing service. *Acme Fast Freight* case, *supra.* Cf. *American Trucking Assns., supra,* 364 U.S. at 6–15; Pennsylvania Truck Lines, Inc. v. United States, 219 F.Supp. 871, 872–873 (W.D.Pa.1963).

■■ The contention is made before us that Drum did not question before the I.C.C. the variance between the certificate and the findings of fact, and that, therefore, Drum cannot raise the issue now. See United States v. L. A. Tucker Truck Lines, Inc., 344 U.S. 33, 35–37, 73 S.Ct. 67, 97 L.Ed. 54 (1952); Watkins Mtr. Lines, Inc. v. United States, 252 F.Supp. 1017, 1019–1020 (M. D.Ga.1966). It is true that no objection upon that ground was made before the I.C.C. We are convinced that such objection was unnecessary, where, as here, the certificate authorizes the same service which Drum offers and a timely objection was made to the I.C.C. that there was no evidence to support a finding of inadequacy of existing service, which is a necessary legal basis for the certificate ordered. It is clear that the evidence was insufficient to support such a finding since the evidence was not specific but was limited to general conclusory statements. Moreover, if we are to apply the National Transportation Policy, we cannot approve a certificate which is inconsistent with the findings and the

inconsistency is such that existing carriers might be endangered.

Given this disposition of the case, it is unnecessary to reach the modified procedure question, except to note that the absence of a full hearing here precluded the development of evidence which would have enabled the I.C.C. to determine the fact as to the adequacy of existing service. The affidavits before the I.C.C. are adequate to show the proprosal of a new and unique service, especially in view of Drum's admission that it could not provide through, in-bond service without the interchange of lading. They are not sufficient, untested by a full hearing and cross-examination, to prove inadequacy of existing service.

Accordingly, the case is remanded to the I.C.C. so that it may either (1) place the restriction against transfer of lading in any certificate issued to Maddux, or (2) conduct such hearings as may be necessary to the determination of the facts as to the adequacy of existing service. The injunction heretofore issued by the Court, enjoining the issuance of the Maddux certificate, will remain in full force and effect pending action by the I.C.C. consistent with this opinion.